**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FORESIGHT FUND MANAGERS LTD.,**<br>*Petitioner,*<br>v.<br>**THE KINGDOM OF SPAIN,**<br>*Respondent.* | Civil Action No. 18-1148 (TSC) |
| **FORESIGHT FUND MANAGERS LTD.,**<br>*Petitioner,*<br>v.<br>**THE KINGDOM OF SPAIN,**<br>*Respondent.* | Civil Action No. 20-925 (TSC) |

## MEMORANDUM OPINION

Petitioner Foresight Fund Managers Ltd. ("Foresight") brings petitions to confirm two arbitral awards issued by the Stockholm Chamber of Commerce against Respondent Kingdom of Spain ("Spain"). Pet., ECF No. 1, Case No. 1:18-cv-1148; Pet., Ex. A, ECF No. 1-1, Case No. 1:20-cv-925.[1] Before the court is Spain's Motion to Dismiss for lack of subject-matter jurisdiction

[1] Unless otherwise specified, all subsequent citations refer to the docket of Case No. 1:18-cv-1148.

and personal jurisdiction. Mot. to Dismiss, ECF No. 145. For the following reasons, the court will DENY Spain's motion.

## I. BACKGROUND

### A. Legal Background

#### 1. Energy Charter Treaty

As the promise of economic growth in the energy sector captivated countries in the early nineties, foreign nations—particularly in Europe—began to negotiate an international framework to incentivize trade. So was born the Energy Charter Treaty, 2080 U.N.T.S. 95 ("ECT"). Signed in 1994 by over forty countries, the ECT aimed to promote "international cooperation in the energy sector." *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1094 (D.C. Cir. 2024) (citing ECT art. 2). Article 10(1) required every "Contracting Party," i.e. signatory to the ECT, *see* ECT art. 1(2), to "encourage" investors organized under the laws of "other Contracting Parties to make Investments in its Area," *id.* art. 10(1). But the ECT also imposed obligations upon contracting countries, including requiring them to provide "fair and equitable treatment" to such investors. *Id.*

Foreseeing the possibility of conflicts, the ECT afforded several mechanisms to resolve disputes between investors and signatory nations, including arbitration. Article 26(3)(a) states that "each Contracting party hereby gives its unconditional consent to the submission of a dispute to international arbitration," except in circumstances inapplicable to this case. *Id.* art. 26(3)(a). If an investor chooses to arbitrate a dispute, it must provide "its consent in writing for the dispute to be submitted to" one of several qualified arbitral fora, including the Arbitration Institute of the Stockholm Chamber of Commerce. *See id.* art. 26(4), 26(4)(c). The investor's written consent,

together with the state's consent to arbitrate evinced in Article 26(3)(a), are "considered to satisfy the requirement for" an "'agreement in writing' for purposes of article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards," *opened for signature* June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "New York Convention"). *See* ECT art. 26(5)(a), 26(5)(a)(ii). Article 26(6) further provides that the arbitral panel "shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law." *Id.* art. 26(6).

### 2. The *Komstroy* Decision

Although the text of Article 26(2) seems to permit investors incorporated under the laws of EU states that have signed the ECT to arbitrate disputes against other EU member signatories, *see id.* art. 26(2), 26(2)(c), in 2021, the Court of Justice of the European Union ("CJEU") held otherwise. In *Republic of Moldova v. Komstroy LLC*, Case C-741/19, ECLI:EU:C:2021:655 (Sept. 2, 2021), the CJEU concluded that the ECT's arbitration mechanism was inapplicable to "disputes between a Member State and an investor of another Member State." *Id.* ¶ 66. The CJEU found that permitting arbitral tribunals—who were neither bound by the Treaty on European Union,[2] nor could certify questions of EU law to the CJEU under the Treaty of the Functioning of the European Union,[3] *see id.* ¶¶ 59, 63—to resolve such disputes would threaten the "preservation of the autonomy and of the particular nature of EU law," *id* ¶ 65.

[2] *See* Consolidated Version of the Treaty on European Union art. 19(1), Oct. 26, 2012, 2012 O.J. (C 326) 13.

[3] *See* Consolidated Version of the Treaty on the Functioning of the European Union art. 267, Oct. 26, 2012, 2012 O.J. (C 326) 47.

The CJEU's ruling was premised on its understanding that the ECT was "an integral part of the legal order of the European Union from the time it enter[ed] into force," *id.* ¶ 23, as the European Union itself (in addition to many of its member states) had signed the agreement, *id.* ¶ 24. In *Komstroy* itself, the parties had chosen to arbitrate a dispute arising under the ECT before a tribunal in France. *Id.* ¶ 32. The CJEU held that the choice of France as "the seat of the arbitration," *id.*, had "the effect of rendering applicable French law as the *lex fori* [law of the forum] to the dispute," *id.* ¶ 33. And because "EU law forms part of the law in force in every Member State," *id.*, and France is a member of the EU, EU law applied to the arbitration, *see id.* ¶ 34. In short, *Komstroy* held that arbitration agreements between EU signatory nations to the ECT and investors organized under the laws of another EU signatory state are invalid under EU law.

### 3. The New York Convention

The United States did not sign the ECT, but it did sign the New York Convention, which permits parties with arbitral awards—including those granted pursuant to the ECT's arbitration mechanism—to enforce those awards in signatory states if certain conditions are met. *See Zhongshan Fucheng Indus. Inv. Co. LTD v. Federal Republic of Nigeria*, 112 F.4th 1054, 1059 (D.C. Cir. 2024). The United States "applies the Convention, on the basis of reciprocity, to the recognition and enforcement of only those awards made in the territory of another Contracting State," and only to those disputes "arising from legal relationships that are considered as commercial." *Id.* (cleaned up) (first quoting New York Convention, 21 U.S.T. at 2650; and then quoting New York Convention art. I(3)).

Congress implemented the New York Convention in the Federal Arbitration Act ("FAA"). Chapter Two of the FAA allows a party with an arbitral award covered by the New York

Convention to "confirm the award" in court. 9 U.S.C. § 207. "Confirmation is the process by which an arbitration award is converted to a legal judgment." *NextEra*, 112 F.4th at 1097 (quoting *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 875 (D.C. Cir. 2021)). It permits the party to "execute on the resulting judgment 'by, for example, attaching the sovereign's commercial assets in the United States.'" *Id.* at 1097–98 (cleaned up) (quoting *Stileks*, 985 F.3d at 875). Congress also declared that an "action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States," and granted district courts "original jurisdiction over such an action or proceeding." 9 U.S.C. § 203.

**B. Facts and Procedural History**

This dispute arises out of a series of failed investments in Spain made between 2007 and 2010 by several energy companies. *See* Pet. ¶¶ 9–11, ECF No. 1 ("Novenergia Pet."); Pet. ¶ 26, Ex. A, ECF No. 1-1, Case No. 1:20-cv-925 ("Foresight Pet."). Beginning in 2007, Spain enacted measures to incentivize foreign investment in its domestic electricity sector, *see* Foresight Pet. ¶ 25, in part by guaranteeing favorable tariffs to renewable energy producers, *see* Novenergia Pet. ¶ 10. Drawn by the favorable regulations, several companies organized under the laws of Luxembourg, Denmark, and Italy invested significant sums of money in photovoltaic plants in Spain. *See* Novenergia Pet. ¶¶ 1, 10; Foresight Pet. ¶¶ 2–5, 26. Those companies were Novenergia II – Energy & Environment (SCA) ("Novenergia"), and Foresight Luxembourg Solar 1 S.À.R.L., Foresight Luxembourg Solar 2 S.À.R.L., GWM Renewable Energy I S.P.A., GWM Renewable

Energy II S.P.A., and Greentech Energy Systems (collectively "Foresight").[4] *See* Novenergia Pet. ¶ 1; Foresight Pet. ¶ 2–5. But the companies incurred heavy losses when Spain ceased to provide the tariffs. *See* Novenergia Pet. ¶ 11; Foresight Pet. ¶¶ 27–28.

Claiming that Spain had violated its obligation of fair and equitable treatment owed to them under Article 10 of the ECT, the companies separately initiated arbitration proceedings against Spain in 2015. *See* Novenergia Pet. ¶¶ 9, 14; Foresight Pet. ¶¶ 20, 29. At the time, their respective countries of incorporation and Spain were all members of the ECT. *See Contracting Parties and Signatories of the Energy Charter Treaty*, Int'l Energy Charter, https://perma.cc/XA3F-L2R2 (last visited Sept. 23, 2026). Although Italy and Spain withdrew from the ECT in 2016 and 2025 respectively,[5] Article 47(3) protects investments made by investors of a contracting state in a signatory country for twenty years after the withdrawal of either country, *see* ECT art. 47(3).

Both companies chose to proceed under the rules of the Arbitration Institute of the Stockholm Chamber of Commerce. *See id.* art. 26(4)(c); Novenergia Pet. ¶¶ 13–16; Foresight Pet. ¶ 20. Two separate tribunals were instituted. After three years of hearings and evidentiary considerations, both tribunals issued final awards for the companies in 2018, granting Novenergia €53.3 million and Foresight €39 million, plus costs and interest. *See* Novenergia Pet. ¶¶ 22–25; Foresight Pet. ¶ 35. In doing so, the tribunals rejected Spain's argument that they lacked

[4] The court refers to the second set of companies as "Foresight" for simplicity because Foresight Fund Managers Ltd. later acquired their interest in the arbitral award and was substituted in their place. *See* Minute Order of Aug. 18, 2025.

[5] *See Italy – Energy Charter*, Int'l Energy Charter, https://perma.cc/8Z78-PWAD (last visited Sept. 23, 2026); *Spain – Energy Charter*, Int'l Energy Charter, https://perma.cc/HW35-47TR (last visited Sept. 23, 2026).

jurisdiction to arbitrate disputes between EU member states and EU investors. *See* Novenergia Pet. ¶ 23; Foresight Pet. ¶¶ 30–31.

Spain appealed both awards to the Svea Court of Appeal, Sweden's court of first instance for challenging the Stockholm tribunals' decisions. *See* Joint Status Report ¶ 1, ECF No. 44; Hope Decl. ¶ 3, ECF No. 44, Case No. 1:20-cv-925. While the appeals were pending, the CJEU issued the *Komstroy* decision. In December 2022, the Svea Court issued a judgment "invalid[ating]" the Novenergia award under Section 33 of the Swedish Arbitration Act. *See Kingdom of Spain v. Novenergia II - Energy & Env't (SCA)*, ECF No. 92-1 at 1, 44 ("Novenergia Judgment"). The Svea Court concluded that "the ECT must be interpreted according to the ruling in *Komstroy* as of the time" the ECT "took effect." *Id.* at 38. And applying *Komstroy*, it held that "an arbitration agreement between the parties could never have been created with Article 26 of the ECT as a basis." *Id.* In June 2024, the Svea Court also "annulled" the Foresight Award under Section 33 of the Swedish Arbitration Act by relying, *inter alia*, on the CJEU's judgment in *Komstroy*. *Kingdom of Spain v. Foresight Luxembourg Solar 1 S.À.R.L.*, ECF No. 115-1 at 1, 12–13 ("Foresight Judgment"). Novenergia petitioned the Swedish Supreme Court to review and reverse the Svea Court's judgment, *see* Joint Status Report at 2, ECF No. 93, but the Court denied the request in July 2023, *see Novenergia II - Energy & Env't (SCA) v. Kingdom of Spain*, ECF No. 99-1 at 4. The Svea Court did not permit Foresight to appeal. *See* Foresight Judgment at 15.

Novenergia and Foresight did not wait for the appellate process to conclude before seeking enforcement of these awards, however. In May 2018, Novenergia filed suit in this court to "confirm[], recognize[], and enforce[e]" its award under Section 207 of the FAA, which implements the New York Convention. *See* Novenergia Pet. at 1, 14. In December 2018,

Foresight filed a similar petition in the Supreme Court of the State of New York. *See* Foresight Pet. at 1, 12. Spain removed the Foresight action to federal court, and it was subsequently transferred to this court in April 2020. *See* ECF Nos. 1, 65, Case No. 1:20-cv-925. Cognizant of the set-aside proceedings ongoing before the Svea Court at the time, this court stayed the Novenergia action in January 2020. *See* Order at 1, ECF No. 43. In September 2020, it consolidated the Foresight action with the Novenergia case and stayed the Foresight action. *See* Order at 1-3, ECF No. 57.

Once the Swedish proceedings had concluded and the D.C. Circuit had decided several issues pertinent to this motion, Novenergia and Foresight moved to lift the stay in January 2025. *See* Consolidated Mot. to Lift Stays, ECF No. 128. This court granted the motion and lifted the stays in May 2025. *See* Minute Order of May 22, 2025. In October 2025, Spain moved to dismiss both petitions under Federal Rules 12(b)(1) and 12(b)(2), alleging that the court lacked subject-matter jurisdiction over the dispute and personal jurisdiction over Spain. *See* Mot. to Dismiss. On the same day, the court granted the companies' motion to substitute Foresight for Novenergia because the latter had "irrevocably and unconditionally assigned all of the rights, interests and benefits associated with the arbitral award" to the former. *See* Second Minute Order of Aug. 24, 2026 (cleaned up) (quoting Mot. to Substitute at 2, ECF No. 156). Despite the substitution, the court will refer to the two petitions as the "Novenergia petition" and the "Foresight petition," and the two companies as "Petitioners" for simplicity.

## II. LEGAL STANDARD

### A. Rule 12(b)(1) Motion to Dismiss for Lack of Subject-Matter Jurisdiction

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). When a foreign sovereign is sued, the Foreign Sovereign Immunities Act ("FSIA") provides "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989)). Although the FSIA states that "a foreign state shall be immune from the jurisdiction" of federal courts, 28 U.S.C. § 1604, the Act carves out several exceptions to this general rule, *see id.* § 1605(a). "Whenever an FSIA immunity exception applies, jurisdiction usually follows." *CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, 605 U.S. 223, 230 (2025). A motion to dismiss for lack of subject-matter jurisdiction thus challenges whether any such exception applies.

The two exceptions relevant to this case are the "arbitration exception" and the "waiver exception." The former permits suits to "confirm an award made pursuant to" an arbitration agreement entered into "by the foreign state with or for the benefit of a private party." 28 U.S.C. § 1605(a)(6). If the award "is or may be governed by a treaty or other international agreement" signed by the United States which "call[s] for the recognition and enforcement of arbitral awards," the suit may proceed. *Id.* Accordingly, for the arbitration exception to apply, a district court must find "three 'jurisdictional facts': (1) an arbitration agreement, (2) an arbitration award, and (3) a treaty potentially governing award enforcement." *NextEra*, 112 F.4th at 1100 (quoting *Chevron Corp. v. Ecuador*, 795 F.3d 200, 204 & n.2 (D.C. Cir. 2015)).

The waiver exception permits a suit to proceed against any foreign nation that "has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). "The FSIA does not specifically define what will constitute a waiver 'by implication.'" *Glob. Voice Grp. SA v. Republic of Guinea*, 177 F.4th 299, 302 (D.C. Cir. 2026) (quoting *Khochinsky v. Republic of Poland*, 1 F.4th 1, 8 (D.C. Cir. 2021)). "For decades, however," the D.C. Circuit has "followed the 'virtually unanimous' precedents construing the implied waiver provision narrowly." *Id.* (internal quotation marks omitted) (quoting *Creighton*, 181 F.3d at 122). "To waive immunity by implication, a foreign sovereign must have 'at some point indicated its amenability to suit.'" *Amaplat Mauritius Ltd. v. Zim. Mining Dev. Corp.*, 143 F.4th 496, 503 (D.C. Cir. 2025) (quoting *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994)). Accordingly, the D.C. Circuit has "consistently concluded that what matters . . . is the foreign sovereign's actual intent." *Id.* (quoting *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 697 (D.C. Cir. 2022)). Courts "'rarely' find waiver 'without strong evidence that this is what the foreign state intended.'" *Id.* (quoting *Khochinsky*, 1 F.4th at 8).

When a foreign sovereign defendant moves for dismissal under Rule 12(b)(1) on sovereign immunity grounds, the court applies a "burden-shifting framework." *See NextEra*, 112 F.4th at 1100. First, the plaintiff "bears the burden of overcoming the presumption of sovereign immunity 'by producing evidence that an [FSIA] exception applies.'" *Ambar v. Federal Republic of Germany*, 596 F. Supp. 3d 76, 81 (D.D.C. 2022) (alteration in original) (quoting *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013)). If the plaintiff meets this initial "burden of production," *NextEra*, 112 F.4th at 1100, the foreign sovereign then bears the "ultimate burden of persuasion" to show that the exception does not apply, *Bell*

*Helicopter*, 734 F.3d at 1183. The sovereign must "establish the absence of the factual basis" of the exception "by a preponderance of the evidence." *NextEra*, 112 F.4th at 1100 (quoting *Chevron*, 795 F.3d at 204).[6]

**B. Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction**

A Rule 12(b)(2) motion to dismiss challenges whether a federal court can exercise jurisdiction over the defendant. The plaintiff "bears the burden of establishing personal jurisdiction over each defendant." *Thompson Hine LLP v. Smoking Everywhere, Inc.*, 840 F. Supp. 2d 138, 141 (D.D.C. 2012) (citing *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 455–56 (D.C. Cir. 1990)).

Where the defendant is a foreign sovereign, Section 1330(b) of the FSIA governs the exercise of "[p]ersonal jurisdiction over a foreign state," 28 U.S.C. § 1330(b), imposing "two substantive requirements," *Antrix*, 605 U.S. at 232. First, a district court must have "subject-matter jurisdiction" over the "claim for relief," which is acquired when "any of the FSIA's immunity exceptions applies." *Id.* (quoting 28 U.S.C. § 1330(b)). Second, a plaintiff must "compl[y] with the FSIA's specialized service-of-process rules." *Id.* (quoting *Republic of Sudan v. Harrison*, 587 U.S. 1, 4–5, 8–13 (2019)). "[U]nder the FSIA, 'subject matter jurisdiction plus service of process equals personal jurisdiction.'" *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012) (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002)).

---

[6] This burden-shifting framework appears in tension with the general rule that the "party invoking federal jurisdiction bears the burden of establishing" it. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Spain points out as much, *see* Mot. to Dismiss at 13 n.11, but this court is bound to apply the framework.

"When serving a foreign sovereign, 'strict adherence to the terms of [Section] 1608(a) [of the FSIA] is required.'" *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994)). Under Section 1608(a), the plaintiff should first attempt service "in accordance with any special arrangement for service between the plaintiff and the foreign state." 28 U.S.C. § 1608(a)(1); *see Angellino v. Royal Fam. Al-Saud*, 688 F.3d 771, 773 (D.C. Cir. 2012). If no such arrangement exists, the plaintiff must deliver "a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents." 28 U.S.C. § 1608(a)(2). If the plaintiff is unable to do so, then the FSIA provides additional methods to effectuate service. *See id.* § 1608(a)(3), (4). But the service requirement is inflexible: Neither "substantial compliance, nor actual notice" suffices. *Barot*, 785 F.3d at 27. "When sufficiency of service is challenged, the burden is on the plaintiff to demonstrate that service has been effected properly." *de Sousa v. Embassy of Republic of Angola*, 229 F. Supp. 3d 23, 27 (D.D.C. 2017) (quoting *Mann v. Castiel*, 681 F.3d 368, 372 (D.C. Cir. 2012)).

## III. ANALYSIS

### A. Subject-Matter Jurisdiction

Petitioners seek to invoke this court's jurisdiction under both the FSIA's arbitration and waiver exceptions. Spain argues that neither exception applies. The court finds that the arbitration exception applies and declines to reach the parties' arguments regarding the waiver exception.

#### 1. Arbitration Exception

For a court to exercise jurisdiction over a foreign sovereign under 28 U.S.C. § 1605(a)(6), three facts must be present: "(1) an arbitration agreement, (2) an arbitration award, and (3) a treaty

potentially governing award enforcement." *NextEra*, 112 F.4th at 1100 (quoting *Chevron*, 795 F.3d at 204 & n.2). The parties dispute whether any of these facts exists. *See* Mot. to Dismiss at 14–27; Opp'n at 12–26, ECF No. 149. They also dispute whether the Svea Court's judgments collaterally estop this court's analysis of the jurisdictional facts. *See* Mot. to Dismiss at 28–33; Opp'n at 21–23. The court concludes that all jurisdictional facts necessary for the arbitration exception to apply are present, and that the Svea Court's judgements are not entitled to issue preclusion.

### i. Existence of Jurisdictional Facts

#### a. Arbitration Agreement

The first jurisdictional fact this court must find is the existence of an arbitration agreement. The FSIA requires "'an agreement made by the foreign state'—*either* 'with' *or* 'for the benefit' of a private party—to submit certain disputes to arbitration." *NextEra*, 112 F.4th at 1101 (quoting 28 U.S.C. § 1605(a)(6)). Typically, a plaintiff can satisfy its burden simply by "producing copies of the ECT." *Id.* at 1104 (cleaned up) (quoting *Stileks*, 985 F.3d at 877). In *NextEra*, the D.C. Circuit explained that the ECT's arbitration provision allowed two types of agreement which would support FSIA jurisdiction. *See id.* at 1101. First, the provision could be understood as an agreement between signatory countries to submit to arbitration "'for the benefit' of a private party," namely an investor formed under the laws of a contracting state. *Id.* at 1101–02 (quoting 28 U.S.C. § 1605(a)(6)). Second, the provision could be interpreted "as 'a unilateral offer to arbitrate' by each sovereign to investors of the other signatory countries." *Id.* at 1102 (quoting *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 50 (2014) (Roberts, C.J., dissenting)). "A foreign investor seeking to take advantage" may "accept the offer by 'filing a notice of arbitration,'" thus

making an agreement "with" a foreign sovereign. *Id.* (cleaned up) (quoting *BG Grp.*, 572 U.S. at 42 (majority op.)).

Indeed, *NextEra* itself involved materially similar facts. There, companies from the Netherlands and Luxembourg obtained arbitral awards against Spain for violations of its obligations under the ECT and sought to enforce the awards in the United States. *See id.* at 1093–97. Spain claimed that the court did not have jurisdiction under the FSIA's arbitration exception because no agreement between the country and the companies had existed. *Id.* at 1101. The D.C. Circuit rejected that argument, reasoning that Spain had "entered into an arbitration agreement—the Energy Charter Treaty itself—that" was "arguably 'for the benefit'" of the companies. *Id.* at 1102 (cleaned up) (quoting 28 U.S.C. § 1605(a)(6)). It was "common ground that, in ratifying the ECT, Spain provided 'unconditional consent' to arbitrate investment disputes with the investors of at least some of the other signatory nations." *Id.* (quoting ECT art. 26(3)(a)). Thus, Spain had formed an agreement "'for the benefit' of the signatory's investors" which satisfied the arbitration exception's requirement. *Id.* at 1103.

Under the principles set forth in *NextEra*, Petitioners have met their initial burden by "producing copies of the ECT," *id.* at 1104 (cleaned up) (quoting *Stileks*, 985 F.3d at 877); *see* ECF No. 2-2; ECF Nos. 1-8 at 20–30, 1-9 at 1–58, Case No. 1:20-cv-925. Those copies show that, by signing and ratifying the ECT, Spain formed an agreement with Luxembourg, Italy, and Denmark "for the benefit" of their investors. *NextEra*, 112 F.4th at 1103. Accordingly, *NextEra* governs the outcome here. The court declines to reach the parties' arguments about whether Spain had formed an agreement "with" the companies themselves within the meaning of the FSIA. *See*

Mot. to Dismiss at 16–20; Opp'n at 20. The court also declines Spain's invitation to depart from *NextEra*, as it is bound to follow binding Circuit precedent. *See* Mot. to Dismiss at 21 n.15.

Spain fails to carry its countervailing burden of persuasion. It first contends that any "third-party beneficiary arbitration agreement contained in Article 26 of the ECT" is "not an arbitration agreement under its governing law." *Id.* at 22. That governing law, according to Spain, is "the law of the seat [of the arbitration]: Sweden." *Id.* Swedish law in turn "incorporates EU law," thus making the *Komstroy* decision "directly applicable." *Id.* And because *Komstroy* did not recognize any arbitration agreements between EU nations that had signed the ECT and investors from such states, Spain contends that the ECT contains no such agreement. *Id.*

*NextEra* rejected a virtually identical argument, however. There, too, Spain argued that *Komstroy* barred any possible arbitration agreement from existing for purposes of jurisdiction under the FSIA. *See NextEra*, 112 F.4th at 1102–03. The Court disagreed. Although the Court declined to resolve whether *Komstroy* foreclosed arbitration agreements "with" private investors, it reasoned that *Komstroy* nonetheless permitted the possibility of arbitration agreements "for the benefit" of private parties under the FSIA. *See id.* at 1102–03.

Applying that rationale, the Court held that it had jurisdiction. It explained that the ECT was made "'for the benefit' of [at least] some investors." *Id.* at 1103 (quoting 28 U.S.C. § 1605(a)(6)). After all, *Komstroy* itself acknowledged that under EU law, "the ECT may require [EU] Member States to comply with the arbitral mechanisms" to resolve disputes with "investors from third States who are also Contracting Parties" to the ECT, so long as those parties are not EU "Member States." *Komstroy* ¶ 65. Thus, all that Spain alleged there—as it does here—was that any agreement created under the ECT did not cover investors from EU signatory nations, such as

Luxembourg, Denmark, and Italy. But that "is an argument regarding the *scope* of the Energy Charter Treaty, not its *existence.* It goes to whether the ECT's arbitration provision applies to these disputes." *NextEra*, 112 F.4th at 1103. And under "binding precedent," the "question 'whether the ECT applies to a dispute' is not 'a jurisdictional question under the FSIA,'" *id.* (cleaned up) (quoting *Stileks*, 985 F.3d at 878–79), but one that "go[es] to the award's enforceability on the merits," *id.* at 1101.

Since *NextEra*, multiple D.C. Circuit opinions have rejected virtually identical arguments to Spain's. In *Hulley Enterprises Ltd. v. Russian Federation*, 149 F.4th 682 (D.C. Cir. 2025), for example, the Court rejected Russia's argument that an arbitration agreement did not exist under the FSIA "even if it did make a standing offer to arbitrate by signing the [Energy Charter] Treaty," because the petitioners there were "not [the] proper beneficiaries of the arbitration clause." *Id.* at 690. The Court explained that whether the petitioners were "investors within the meaning of the arbitration clause 'is an argument regarding the *scope* of the Energy Charter Treaty, not its *existence*.'" *Id.* (quoting *NextEra*, 112 F.4th at 1103). Likewise, in *Stabil LLC v. Russian Federation*, 167 F.4th 506 (D.C. Cir. 2026), the Court explained that questions about "territorial reach and treaty coverage go to the scope of the agreement—to arbitrability—not to the existence of consent." *Id.* at 520. And in *Marseille-Kliniken AG v. Republic of Equatorial Guinea*, 153 F.4th 1262 (D.C. Cir. 2025), the Court held that "arguments that an arbitration agreement violates domestic law" are "not jurisdictional defenses under the FSIA." *Id.* at 1268. The appropriate way to challenge the existence of an agreement after *NextEra* is to claim that an investment treaty was

not an offer to arbitrate "with anybody or about anything." *Hulley*, 149 F.4th at 689. But, for obvious reasons, Spain does not go so far.[7]

Attempting to avoid *NextEra*'s reach, Spain proffers a declaration from an expert in international treaty interpretation, *see* Hollis Decl., ECF No. 145-7, who suggests that even though the ECT is a "multilateral treaty" between many nations, *id.* ¶ 16, it generates only "bilateral obligations" running between pairs of countries, Hollis Reply Decl. ¶ 9, ECF No. 151-1, for instance "between Spain, one the one hand, and another EU Member State, like Luxembourg, Denmark, and/or Italy, on the other," Hollis Decl. ¶ 16. According to Spain, this difference is significant because it shows that the question of whether Spain formed an agreement with the investors' home countries is a jurisdictional one about existence, not a merits one about scope. *See* Reply at 13.

The court need not delve into the details of international treaty interpretation to reject Spain's argument. Simply put, *NextEra* understood the ECT as a "multilateral investment treaty" generating multilateral obligations. 112 F.4th at 1093; *see also id.* at 1102–04. This court cannot depart from that understanding. Spain apparently recognizes as much, but nonetheless urges this court to hold otherwise because *NextEra* "did not consider the interpretive agreement" concerning Article 26 that Spain signed with Petitioners' home states in June 2024. Reply at 16; *see id.* at 10,

---

[7] Because the court follows *NextEra*'s holding that the ECT contains an arbitration agreement as a matter of jurisdictional fact under the FSIA even if EU law were to apply, *see* 112 F.4th at 1102–03, it declines to address Spain's fallback argument that the ECT would not be understood to contain an arbitration agreement even if international law governed, *see* Mot. to Dismiss at 22–23. The court does note however, that contrary to Petitioners' argument, *see* Opp'n at 13, 16, *NextEra* did not conclude that courts should exclusively consider the plain text of the investment treaty in assessing whether the ECT contains an arbitration agreement. The D.C. Circuit simply did not go so far. *See NextEra*, 112 F.4th at 1102–03.

11 n.3; Mot. to Dismiss at 22–23; Hollis Decl. Ex. 2, ECF No. 145-9 ("Interpretive Agreement"). Under that agreement, EU member states "reaffirm[ed]" a "common understanding" of Article 26, namely that it "cannot and never could serve as a legal basis for intra-EU arbitration proceedings." Interpretive Agreement ¶ 1. Spain argues that the agreement is "a material development post-dating briefing and oral argument" that ought to compel a different result. Reply at 16. Not so. Even if this court could depart from *NextEra* on the basis of the June 2024 agreement, it finds little reason to. As noted, the agreement was signed in June 2024, well after Petitioners commenced arbitration proceedings. And as it was not signed by all the signatories to the ECT, it could not have modified the "multilateral" obligations that signatories to the ECT owed under *NextEra*. 112 F.4th at 1093; *see also id.* at 1102–04. Spain's argument thus holds no water.

Spain next argues that *NextEra* is inapposite because even if the ECT contained an arbitration agreement for the benefit of Petitioners, the Swedish tribunals did not render their awards "pursuant to" that agreement. Mot. to Dismiss at 21–22; *see* 28 U.S.C. § 1605(a)(6). It contends that the tribunals instead made their awards pursuant to an agreement formed when Petitioners "accepted Spain's standing offer to arbitrate by submitting" a "request for arbitration." Mot. to Dismiss at 15 (quoting ECF No. 22 at 24); *see also* Foresight Pet. ¶ 9. Spain argues that because the tribunals made their awards "pursuant to" an agreement "with" Petitioners, and Petitioners have only shown the existence of an agreement "for the[ir] benefit," the award does not satisfy the FSIA's "pursuant to" requirement. *See* Mot. to Dismiss at 15, 20–21; Reply at 3–5 (first citing Novenergia Award ¶¶ 73, 74, ECF No. 2-1; and then citing Foresight Award ¶¶ 7, 8, ECF No. 11-4, Case No 1:20-cv-925).

But the fact that the Swedish tribunals did not rest their decisions on an agreement "for the benefit" of Petitioners is irrelevant. Those tribunals were not adjudicating a question under the FSIA; they were applying a different law, almost a decade before *NextEra*. Spain cannot fault the Swedish tribunals for failing to cite a theory of agreement that had not yet been developed by a different court under a different law.

In any event, Spain's cramped reading of "pursuant to" finds no support in precedent or statutory text. As the D.C. Circuit has explained, it is enough to show that an "award was made *pursuant to the ECT*" to establish jurisdiction under the FSIA. *Stileks*, 985 F.3d at 877 (emphasis added). The Court did not impose any further requirement that the arbitral panel also have cited the same theory of agreement under which petitioners invoke the court's jurisdiction. And that rule makes sense. Section 1605(a)(6) of the FSIA permits confirmation of "an award made pursuant to such an agreement to arbitrate," where "such" refers to the two different types of agreements described earlier: those made "with" a private party and those made for its "benefit." 28 U.S.C. § 1605(a)(6). The text simply requires the award to be made pursuant to *an* agreement that falls within those categories; it does require the award to be based on "the" particular arbitration agreement identified by a given tribunal. Under *Stileks* and the plain meaning of the FSIA, all Petitioners need to show is that the Swedish tribunals made their awards pursuant to the ECT. They have done so.[8]

[8] Spain's citations to *Chevron*, 795 F.3d at 204, and *Al-Qarqani v. Saudi Arabian Oil Co.*, 19 F.4th 794, 801–02 (5th Cir. 2021) are unavailing, *see* Mot. to Dismiss at 15. As to *Chevron*, Spain quotes a party's argument that "an award [must be] based on th[e] agreement," not the D.C. Circuit's holding, which simply looked for "the existence of an award." 795 F.3d at 204; *see also Stileks*, 985 F.3d at 877–78 (interpreting *Chevron* similarly). And the Fifth Circuit in *Al-Qarqani*

Finally, Spain complains that Petitioners should not be able to use the "benefit of" theory of arbitration agreement because they did not present it before the arbitral tribunals. *See* Reply at 4-5. To be sure, Petitioners consistently represented, even before this court, that the relevant arbitration agreement was made between them and Spain. *See id.*; *see also* ECF No. 22 at 24 ("Novenergia accepted Spain's standing offer to arbitrate by submitting the request for arbitration to the SCC."); Foresight Pet. ¶ 9 ("The arbitration agreement between the Petitioners and Spain consists of two elements: (i) Spain's consent contained in Article 26(3) of the ECT; and (ii) Petitioners' consent contained in their Request for Arbitration."). But those representations occurred well before *NextEra*, and in the case of the Swedish tribunals, outside the context of the FSIA. Accordingly, the court finds that the first jurisdictional fact exists.

**b. Arbitration Award**

The next requirement for jurisdiction under the arbitration exception is the existence of an arbitration award. *See Stileks*, 985 F.3d at 877 (citing *Chevron*, 795 F.3d at 204). Petitioners have carried their burden of production by presenting copies of the awards entered in their favor by the Stockholm Chamber of Commerce. *See Marseille-Kliniken AG*, 153 F.4th at 1267 (producing a "Swiss arbitral award" was enough for petitioner there to meet its burden); *see also* Novenergia Award, ECF No. 2-1; Foresight Award, ECF No. 11-4, Case No 1:20-cv-925. Those decisions show that Novenergia and Foresight were awarded €53.3 million and €39 million on February 15, 2018, and November 14, 2018, respectively, plus costs and interest. *See* Novenergia Award ¶ 860; Foresight Award ¶ 562. That suffices.

---

held that it did not have jurisdiction because "there exist[ed] no agreement among the parties to arbitrate," not because the award had not been made "pursuant to" the agreement. 19 F.4th at 802.

Contrary to Spain's argument, the fact that the awards were later annulled by the Svea Court is immaterial. In *Process & Industrial Developments Ltd. v. Federal Republic of Nigeria*, 27 F.4th 771 (D.C. Cir. 2022) ("*P&ID*"), Nigeria—like Spain—argued that the court did not have jurisdiction under the FSIA's arbitration exception because the "Federal High Court of Nigeria [had] set aside the arbitral tribunal's liability award." *Id.* at 776. The D.C. Circuit rejected that argument, holding that "a foreign court's order ostensibly setting aside an arbitral award has no bearing on the district court's jurisdiction and is instead an affirmative defense properly suited for consideration at the merits stage." *Id.* at 772. *P&ID* thus forecloses Spain's objection.

Spain's multifarious attempts to distinguish *P&ID* fail. First, it argues that unlike the arbitral award in *P&ID*, which had merely been "set aside" by the Nigerian court, the arbitral awards here were held "never [to] have existed" by the Svea Court. Reply at 16, 18. According to Spain, the Svea Court determined that the awards were "void *ipso facto* and *ab initio*" under Section 33 of the Swedish Arbitration Act. Mot. to Dismiss at 24 (quoting Bylander Decl. ¶ 23, ECF No. 145-2). But Spain offers no good reason why the distinction between a "set aside" order and a "void *ab initio*" order matters under *P&ID*. It contends that the "set aside" order in *P&ID* went to the "validity or enforceability" of the arbitral award, which is "a merits question," *see P&ID*, 27 F.4th at 776 (emphasis omitted), whereas the Svea Court's "void *ab initio*" order goes to the award's "existence," which is jurisdictional, *see* Reply at 18. But that rationale proves too much. Under it, Nigeria could have prevailed in *P&ID* simply by characterizing its High Court's decision as going to the very "existence" of the award as well.

Next, Spain suggests that *P&ID* is inapposite because the High Court of Nigeria "lacked authority" to set aside the arbitral award, as "Nigeria was not the seat of the arbitration" for the

underlying dispute. Mot. to Dismiss at 25 n.17. But Spain fails to acknowledge that the D.C. Circuit assumed that the Nigerian court's set-aside decision was valid for purposes of the case. *See P&ID*, 27 F.4th at 776 n.4. It nonetheless concluded that the set-aside order had no bearing on the jurisdictional analysis. *See id.* at 776. So too here. Spain's further insistence that "[o]nly a court in a country with primary jurisdiction over an arbitral award may annul that award," Mot. to Dismiss at 23 (quoting *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir 2007)), is misplaced because that, too, is "a defense to confirmation under the New York Convention," and goes to the merits, not the jurisdictional issue presented here, *Stileks*, 985 F.3d at 878. Spain next claims that the "purported legal effect" of the Nigerian court's decision was "unclear," and the decision "offered no reasoning or explanation." Mot. to Dismiss at 25 n.17 (quoting *P&ID*, 27 F.4th at 773). But the D.C. Circuit did not rest any part of its analysis on the Nigerian High Court's lack of explanation. *See P&ID*, 27 F.4th at 776. And the Nigerian court's decision had the same functional effect as the Svea Court's judgments here.

Spain's remaining arguments likewise fail. It observes that the Nigerian court's decision in *P&ID* only set aside the tribunal's finding of "liability," not the "final award," whereas the Svea Court here annulled the final award. Mot. to Dismiss at 25 n.17 (citing *P&ID*, 27 F.4th at 772–73). But again, Spain offers no reason why that distinction makes any difference. Indeed, no good reason seems to exist, for the final award in *P&ID* ostensibly depended on the finding of liability. Finally, Spain notes that Novenergia did not file a "duly-certified" copy of the tribunal's award before this court. Reply at 17 n.8. It does not, however, suggest that the omission has any effect on the jurisdictional analysis, nor does this court perceive any such effect.

Ultimately, Spain's arguments boil down to its contention that Swedish law ought to govern the question of whether an award exists, and under Swedish law, the awards in favor of Petitioners have always been "legally non-existent." Mot. to Dismiss at 24 (quoting Bylander Decl. ¶ 23). As explained above, that argument would effectively eviscerate *P&ID*. And in any event, Spain cannot seriously contest that the Svea Court's determination was "not a factual one, but a legal conclusion about the importance attributed to certain facts under the law"—namely the purportedly invalid arbitral award. *Hum., S.E. v. Czech Republic—Ministry of Health*, 824 F.3d 131, 137 (D.C. Cir. 2016); *see* Mot. to Dismiss at 24 ("*Legally such awards do not exist.*" (quoting Bylander Decl. ¶ 23)); *id.* (The awards have "lacked *legal* existence under Swedish law ever since they were purportedly issued." (emphasis added)); *see also* Reply at 17. Under the FSIA, however, the "existence of an award" is not a legal question, but "a factual question that the District Court must resolve." *Chevron*, 795 F.3d at 204. Because Spain has failed to carry its burden of persuasion on the question, the court resolves it in Petitioners' favor.[9]

#### c. Treaty Potentially Governing Award Enforcement

The third and final fact that must exist for the arbitration exception to apply is "a treaty potentially governing award enforcement." *NextEra*, 112 F.4th at 1100 (citing *Chevron*, 795 F.3d at 204 & n.2). The word "potentially" is important; it derives from the plain text of the FSIA, which requires only that an award "*may be* governed by a treaty," not that it must be. 28 U.S.C.

[9] In passing, Spain contends that the question of whether an award exists cannot be answered in "a legal vacuum" because the "assessment of jurisdictional facts often requires a legal determination." Reply at 17 & n.9. Whatever the metaphysics of Swedish law, however, it is undisputed as a factual matter that the arbitral tribunals issued awards in Petitioners' favor.

§ 1605(a)(6) (emphasis added). Thus, all that the court needs to determine is whether a treaty "plausibly could" cover the award. *Stabil*, 167 F.4th at 522.

Petitioners have met their burden of production to show that the New York Convention may cover these arbitral awards. *See* Opp'n at 25. The New York Convention governs "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." New York Convention art. I(1). Under it, arbitral awards are enforceable so long as "the place of the award . . . is in the territory of a party to the Convention." *Creighton*, 181 F.3d at 121 (quoting Restatement (Third) of Foreign Relations Law § 487 cmt. b (A.L.I. 1987)). Chapter Two of the FAA, which implements the Convention, imposes two further conditions. First, the dispute must "aris[e] out of a legal relationship," 9 U.S.C. § 202, that "explicitly contemplate[s] which parties it would obligate," determines "the extent of the[ir] obligations," and provides "the legal framework to govern the arrangement," *Stabil*, 167 F.4th at 522 (quoting *Hum., S.E.*, 824 F.3d at 135). Second, the statute requires the relationship to be "commercial" in nature. 9 U.S.C. § 202.

There is no doubt all three requirements are satisfied here. To start, the awards at issue were made in Sweden, a signatory to the New York Convention. *See Contracting States*, N.Y. Convention, https://perma.cc/65MP-2JT2 (last visited Sept. 23, 2026). Next, the dispute between Petitioners and Spain "arise[s] out of a legal relationship" forged by the ECT. *Zhongshan*, 112 F.4th at 1062 (quoting 9 U.S.C. § 202). As explained above, the ECT requires "[e]ach Contracting Party" to guarantee "the most constant protection and security" to investments made by "Investors of other Contracting Parties." ECT art. 10(1). It requires states to provide investors from other signatory nations "fair and equitable treatment." *Id.* And it supplies a menu of options to resolve

disputes between investors and Contracting Parties, including arbitration. *See id.* art. 26(3). Finally, the legal relationship between Petitioners and Spain was plainly "commercial." *Zhongshan*, 112 F.4th at 1062 (quoting 9 U.S.C. § 202). Both Novenergia and Foresight invested heavily in photovoltaic facilities to provide renewable energy to Spanish consumers. *See* Novenergia Pet. ¶ 10; Foresight Pet. ¶¶ 25–26. Given these facts and the D.C. Circuit's repeated exhortations that "the New York Convention 'is exactly the sort of treaty Congress intended to include in the arbitration exception,'" *P&ID*, 27 F.4th at 776 (quoting *Creighton*, 181 F.3d at 123–24); *see also Stabil*, 167 F.4th at 522, Petitioners have met their burden of showing that a treaty "potentially governs enforcement of the award," *Stabil*, 167 F.4th at 517.

Spain contends that the New York Convention does not govern Petitioners' awards. It argues that Petitioners cannot satisfy Article II of the Convention, which requires "an agreement in writing where the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them." Mot. to Dismiss at 25 (cleaned up) (quoting New York Convention art. II(I)). According to Spain, no such written agreement exists because "there are no arbitration agreements between Petitioners and Spain" under Swedish law, and because any agreement "for the benefit of" Petitioners is not between Petitioners and Spain, but the signatory nations themselves. *Id.* at 26-27. Spain also argues that Novenergia cannot satisfy Article IV of the Convention because it did not present a notice of arbitration along with its petition to confirm the award before this court. *See id.* at 26–27.

But Spain's arguments "conflate[] the jurisdictional standard of the FSIA with the standard for review under the New York Convention." *Stileks*, 985 F.3d at 878 (quoting *Chevron*, 795 F.3d at 205). For jurisdictional purposes, this court need only find that Petitioners' awards may

"potentially" be governed by the New York Convention. That inquiry turns on the factors identified above: whether the award was made in a signatory nation, whether the dispute arises out of legal relationship, and whether the relationship is commercial in nature. *See Hum., S.E.*, 824 F.3d at 136; *Stabil*, 167 F.4th at 522. Those factors are clearly satisfied here.

Indeed, the D.C. Circuit has declined invitations like Spain's to import the requirements for enforcement under the New York Convention into the jurisdictional inquiry under the FSIA. In *Stileks*, for example, it rejected Moldova's argument that the arbitration exception was not triggered, essentially because the award there did not meet the requirements of Article V(1)(c) of the Convention. *See* 985 F.3d at 878. The Court explained that Moldova's argument was "a defense to confirmation under the New York Convention," not a barrier to jurisdiction under the FSIA. *Id.* Spain, like Moldova, appears to be seeking "two bites at the apple of the merits of its dispute" with Petitioners by requiring them to produce an agreement in writing. *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 63 (D.D.C. 2013). The court cannot permit that stratagem. And to the extent Spain asserts that no arbitration agreement has ever existed, the court has already rejected that argument. *See supra* Part III.A.1.i.a.

Further, Spain cites no precedent—nor can the court identify any—requiring a written agreement for purposes of jurisdiction under the FSIA. Spain's citation to an unpublished case from this district, *Olive Group FZ-LLC v. Afghanistan Civil Aviation Authority*, No. 24-cv-2170, 2025 WL 1662961, at *3 (D.D.C. June 12, 2025), *see* Mot. to Dismiss at 25, is meritless, because the case it relied on in turn, *Compagnie Sahélienne d'Entreprise v. Republic of Guinea*, No. 20-cv-1536, 2021 WL 2417105, at *2 (D.D.C. June 14, 2021), analyzed the writing requirement to

determine whether a claim fell within the ambit of the New York Convention for purposes of the FAA. The case did not involve jurisdiction under the FSIA's arbitration exception.[10]

Nor do Spain's citations to *Chevron*, 795 F.3d at 204, and *Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d. 179, 188 (D.D.C. 2016), show that Novenergia's failure to present the notice of arbitration at the time it filed its petition resulted in an incurable jurisdictional defect, *see* Mot. to Dismiss at 27. In *Chevron*, the Court explained that a party seeking to enforce an award will ordinarily meet its burden of production simply by producing the investment treaty and a notice of arbitration. *See* 795 F.3d at 204. But the Court was concerned with the existence of an arbitration agreement "with" the state formed by the oil companies' acceptance of Ecuador's "standing offer" to arbitrate. *Id.* at 206. The same was true in *Stati*, which involved an arbitration agreement "with" the country of Kazakhstan. *See* 199 F. Supp. 3d. at 185, 188. By contrast, when an investment treaty creates an arbitration agreement "for the benefit of" investors, the petitioner can meet its burden of production merely by producing a copy of the treaty itself. *See Stabil*, 167 F.4th at 520. That jurisdictional requirement has been met here.

Likewise, Spain's citations to *Jiangsu Beier Decoration Materials Co. v. Angle World LLC*, 52 F.4th 554, 561 (3d Cir. 2022) and *Al-Qarqani v. Chevron Corp.*, 8 F.4th 1018, 1023 (9th Cir. 2021) are unpersuasive, *see* Mot. to Dismiss at 28. Both cases state that proof of a written

[10] The only D.C. Circuit case the court has identified which applies an additional jurisdictional requirement analyzed whether the parties were "persons" within the meaning of Article I(1) of the Convention. *See Zhongshan*, 112 F.4th at 1065. That requirement does not stem from 9 U.S.C. § 202. In any event, it is met here. Foreign states are "persons" within the meaning of Article I(1). *See Zhongshan*, 112 F.4th at 1065–66. So too are private entities like Petitioners—indeed, the "Court of Appeals consistently has held that the Convention, as codified, provides a basis for federal courts to enforce arbitral awards between private entities and foreign states." *Belize Bank Ltd. v. Gov't of Belize*, 191 F. Supp. 3d 26, 34 (D.D.C. 2016).

arbitration agreement is essential for enforcement of an award under Article IV of the New York Convention. *See Jiangsu*, 52 F.4th at 559–561; *Al-Qarqani*, 8 F.4th at 1023. But that has nothing to do with jurisdiction under the FSIA. *See Jiangsu*, 52 F.4th at 559; *Al-Qarqani*, 8 F.4th at 1024. If anything, the Ninth Circuit's decision in *Al-Qarqani* undermines Spain's argument. That decision clarified that a court need not "assess an award against the Convention's requirements before exercising jurisdiction" over enforcement proceedings. *Al-Qarqani*, 8 F.4th at 1025. Accordingly, the Ninth Circuit concluded that the lower court had erred by dismissing a petition for lack of subject-matter jurisdiction for failing to meet the Convention's requirements. *See id.* at 1021, 1025. The court should instead have denied enforcement on the merits. *See id.* at 1025.

Because Spain has failed to meet its burden of persuading the court that the New York Convention could not plausibly govern Petitioners' award, the court finds the third jurisdictional fact present as well. Accordingly, the arbitration exception applies.

**ii. Collateral Estoppel**

Failing to carry its burden on any of the three jurisdictional facts, Spain insists that the Svea Court's judgments estop this court's jurisdictional analysis. *See* Mot. to Dismiss at 28–33. Spain invokes the doctrine of collateral estoppel (or "issue preclusion"), which prohibits "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001)). The question of whether the judgments of foreign courts can preclude jurisdictional fact-finding under the FSIA's arbitration exception remains an open one in this Circuit, and the Court of Appeals has twice declined to answer it. *See Deutsche Telekom, A.G. v. Republic of India*, 155 F.4th 694, 703 (D.C. Cir. 2025); *Hulley*, 149

F.4th at 691–92. But it has nonetheless provided valuable guidance on how district courts should go about analyzing the question.

In *Hulley*, the D.C. Circuit instructed the district court tackling the question on remand to first determine "whether issue preclusion [even] applies to jurisdictional questions under the FSIA." 149 F.4th at 691. If so, then the court was to consider "whether preclusion extends to *foreign* judgments," as opposed to just domestic ones. *Id.* That difference was potentially significant: *Hulley* identified several cases which had "given preclusive effect to jurisdictional determinations by domestic courts," but could find none in which "a court ha[d] given preclusive effect to a foreign judgment in order to exercise jurisdiction over a foreign sovereign under the FSIA." *Id.* Nonetheless, *Hulley* countenanced the possibility that a foreign judgment could preclude jurisdictional fact-finding under the FSIA. *Id.* at 691–92 (quoting *Rose v. Himely*, 8 U.S. (4 Cranch) 241, 270 (1808)). It further explained that if the district court concluded that foreign judgments could have preclusive effect, it was to then assess whether the foreign judgment was entitled to recognition as matter of comity under the factors enumerated in *Hilton v. Guyot*, 159 U.S. 113, 202–03 (1895). *Hulley*, 149 F.4th at 692. And if the judgment was entitled to recognition, the court finally had to determine "how the *Hilton* factors intersect with the ordinary standard for assessing collateral estoppel." *Id.* In short, *Hulley* suggested that if the analysis had arrived at this stage, a foreign judgment could have preclusive effect if it satisfied both the *Hilton* factors and the requirements for issue preclusion. *Id.* (first citing *Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19, 33–34 (D.D.C. 2007); and then citing *Alfadda v. Fenn*, 966 F. Supp. 1317, 1325–32 (S.D.N.Y. 1997)).

Petitioners and Spain have leapfrogged the order of operations *Hulley* prescribes. Neither party addresses whether the Svea Court's judgments could even have preclusive effect. For its part, Spain simply assumes as much and skips to the final prong of the inquiry, insisting that the Svea Court's judgments satisfy the *Hilton* factors and the requirements for collateral estoppel. *See* Mot. to Dismiss at 29–33. Meanwhile, Petitioners fail to seriously dispute whether the *Hilton* factors are satisfied, and instead challenge, *inter alia*, whether the requirements for collateral estoppel are met. *See* Opp'n at 22–23.

The court does not opine on the questions of whether foreign judgments can preclude determination of jurisdictional facts under the FSIA and whether the Svea Court's judgments satisfy the *Hilton* factors. But it concludes that even assuming the Svea Court's judgments could preclude, they do not do so here because they fail to meet the standard for issue preclusion to apply. Under that standard, (1) "the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case," (2) "the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case," and (3) "preclusion in the second case must not work a basic unfairness to the party bound by the first determination." *Martin v. Dep't of Justice*, 488 F.3d 446, 454 (D.C. Cir. 2007) (cleaned up) (quoting *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir.1992)); *see Hurst*, 474 F. Supp. 2d. at 32 (concluding that federal standards of issue preclusion apply in assessing whether foreign judgments have preclusive effect).

The Svea Court's judgments lack preclusive effect because they did not decide the "same issue[s]" now before this court. *Martin*, 488 F.3d at 454 (quoting *Yamaha*, 961 F.2d at 254). The Supreme Court has explained that deciding the "same" issue requires applying the same "legal

standards." *Smith v. Bayer Corp.*, 564 U.S. 299, 309 (2011). If courts "apply different law," they "decide distinct questions" and "differe[nt]" issues, and thus the first court's "resolution of one issue does not preclude" the second court's "determination of another." *Id.* at 309, 312. Here, the Svea Court applied Swedish law (which in turn incorporates EU law principles) to determine that no arbitration awards had ever existed under Section 33 of the Swedish Arbitration Act. *See* Novenergia Judgment at 37–39; Foresight Judgment at 11–13. That is not the standard under the FSIA. As the D.C. Circuit has explained, "the existence of an award is a factual question." *Chevron*, 795 F.3d at 204. Spain does not—and cannot—seriously claim that the Svea Court made a factual finding that no awards ever existed. *See, e.g.*, Mot. to Dismiss at 24 ("*Legally such awards do not exist.*" (quoting Bylander Decl. ¶ 23)). Yet that very concession deprives the Svea Court's judgments of any preclusive effect regarding the existence of the awards.

Likewise, the Svea Court's conclusion that no arbitration agreements existed between Spain and Petitioners fails to meet the standards for issue preclusion. The Svea Court's conclusion was grounded in Swedish law, which in turn incorporates EU law principles, most notably the CJEU's *Komstroy* decision. *See* Novenergia Judgment at 37–39; Foresight Judgment at 11–13. But EU law does not recognize the distinction between the "scope" and "existence" of an arbitration agreement that the D.C. Circuit has drawn. *See NextEra*, 112 F.4th at 1103. That difference is dispositive as to the existence of an arbitration agreement. *See supra* Part III.A.1.i.a. "Because the legal standards" in the Svea Court and this court differ, "the issues before the courts differ[]," and the Svea Court's judgments do not preclude the question of whether an arbitration agreement exists. *Smith*, 564 U.S. at 309.

Spain also insists that the Svea Court's judgments preclude this court from determining that the New York Convention potentially governs enforcement of the awards, because that finding depends on "the existence of an 'agreement in writing.'" Mot. to Dismiss at 29. According to Spain, the Svea Court held that there were *no* agreements, and *a fortiori*, there cannot be any written agreements. *See id.* But this court has already rejected the purported preclusive effect of the Svea Court's determinations about the existence of arbitration agreements. And in any event, the need for a written agreement is a merits requirement under the New York Convention, not a jurisdictional requirement under the FSIA. *See supra* Part III.A.1.i.c.

Finally, Spain suggests that "foreign judgments give rise to collateral estoppel even if they apply a different law, so long as the requirements for estoppel are satisfied." Reply at 22 n.12. But, as already explained, when courts apply different legal standards, they adjudicate different issues, and thus issue preclusion cannot apply. *See Smith*, 564 U.S. at 309–12. In any event, Spain offers no binding precedent for its assertion, and the cases it cites lend no weight to its argument. *See* Reply at 22 n.12. In *Hurst*, the court found it was precluded by a Scottish court's factual findings which were necessary to support a criminal conviction in that jurisdiction. *See* 474 F. Supp. 2d at 33–34. But that was because of the different evidentiary standards in criminal and civil cases, and the general rule that a "criminal conviction is conclusive proof and operates as an estoppel on the defendants as to the facts supporting the conviction in a subsequent civil action." *Id.* (quoting *Hinton v. Shaw Pittman Potts & Trowbridge*, 257 F. Supp. 2d 96, 100 (D.D.C. 2003)). No such criminal judgment is involved here. And in *Phillips USA, Inc. v. Allflex USA, Inc.*, 77 F.3d 354 (10th Cir. 1996), the Tenth Circuit upheld the district court's application of res judicata (or "claim preclusion") to bar litigation of a party's tortious interference with contract claim after

an Australian court had ruled on its breach of contract claim. *See id.* at 358–61. That case did not even concern issue preclusion. Accordingly, it would be inappropriate to apply issue preclusion here.

**2. Waiver Exception**

In the alternative, Petitioners argue that the FSIA's waiver exception supports this court's jurisdiction. *See* Opp'n at 26–28. They insist that Spain "waive[d] its immunity from arbitration-enforcement actions in other signatory states" when it signed the New York Convention. *See id.* at 27 (quoting *Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019)). Spain retorts that Foresight (but not Novenergia) failed to timely raise the waiver exception, and that in any event, Spain did not waive its immunity simply by entering the Convention. *See* Mot. to Dismiss at 33 & n.18, 35 n.19. Spain also argues that the arbitration exception "preempts application of the waiver exception." *Id.* at 33.

"The waiver issue remains 'unsettled' in our Circuit." *NextEra*, 112 F.4th at 1100 (quoting *P&ID*, 27 F.4th at 774). The D.C. Circuit has declined to "formally adopt" the theory that signatories to the New York Convention have impliedly waived their sovereign immunity in actions like this one, *Stabil*, 167 F.4th at 526 (cleaned up) (quoting *P&ID*, 27 F.4th at 774), for that rationale carries "significant policy concerns," *P&ID*, 27 F.4th at 775 n.3.

But this court need not reach the parties' waiver arguments because it has concluded that it has jurisdiction under the FSIA's arbitration exception. *See Metro. Wash. Chapter, Associated Builders & Contractors, Inc. v. District of Columbia*, 62 F.4th 567, 576 (D.C. Cir. 2023) (explaining the "cardinal principle of judicial restraint" that courts should resolve no more than is necessary to decide the case (quotation omitted)).

**B. Personal Jurisdiction**

In the alternative, Spain argues that this court lacks personal jurisdiction over it because "neither the arbitration exception nor the waiver exception to Spain's sovereign immunity applies" to either petition to confirm. Mot. to Dismiss at 36. To be sure, under the FSIA, "subject matter jurisdiction plus service of process equals personal jurisdiction." *GSS Grp.*, 680 F.3d at 811 (quoting *Price*, 294 F.3d at 95). But the court has already concluded that it has subject-matter jurisdiction under the arbitration exception. *See* Part III.A.1. Accordingly, it rejects Spain's argument.

Spain also argues that the court "lacks personal jurisdiction over Spain with respect to the Foresight petition because the Foresight Petitioners failed to satisfy the FSIA's service requirements." Mot. to Dismiss at 36. Specifically, Spain contends that Foresight failed to meet Section 1608(a)(2)'s requirement to deliver "a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents," 28 U.S.C. § 1608(a)(2)—here, the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638 ("Hague Service Convention"). *See* Mot. to Dismiss at 37. That Convention, which has been signed by both the United States and Spain, *see HCCH Members*, HCCH, https://perma.cc/Z7YU-LKF5 (last visited Sept. 23, 2026), creates a framework for serving process on foreign sovereigns. As the D.C. Circuit has explained, "Articles 2 to 6 of the Hague Convention require that a plaintiff request service from a Central Authority designated by the receiving state and receive a certificate of service from the Central Authority stating it has served the defendant by a method consistent

with the state's internal law." *Saint-Gobain Performance Plastics Eur. v. Bolivarian Republic of Venezuela*, 23 F.4th 1036, 1038 (D.C. Cir. 2022).

To be sure, Foresight initially failed to meet this standard. In 2019, it transmitted the petition and related documents to Spain's Abogacía General del Estado – Dirección del Servicio Jurídico del Estado, a division in the Attorney General's office. *See* Collins Aff. ¶¶ 2–4, ECF 8-1, Case No. 1:20-cv-925. But that was not the entity Spain had designed as its "Central Authority" for receiving service under the Hague Service Convention—the Subdirección General de Cooperación Jurídica Internacional, an agency for International Legal Cooperation, was. *See Spain – Central Authority & Practical Information*, HCCH, https://perma.cc/AUW9-KK28 (last visited Sept. 23, 2026). In 2025, Foresight reattempted service, but again sent the summons to the Attorney General's office. *See* ECF No. 139 at 1.

In November 2025, however, Foresight represented that it was "re-serving Spain through its Central Authority." Opp'n at 29. And in April 2026, it filed a certificate showing that service had been completed pursuant to Articles 2 through 6 of the Hague Service Convention. *See* Certificate, ECF No. 157-1. Accordingly, the court will dismiss as moot Spain's argument that it was not properly served. *See Barot*, 785 F.3d at 29 (explaining that defective service may be cured by properly following the Hague Service Convention's procedures).

The court also declines to reach Foresight's claim that service was nonetheless properly effectuated under Article 10(a) of the Hague Service Convention. *See* Opp'n at 29. It notes, however, that district courts in this Circuit are divided on whether the FSIA permits a foreign sovereign to be served under Article 10(a) without first attempting to serve its Central Authority. *Compare Koch Mins. Sàrl v. Bolivarian Republic of Venezuela*, 514 F. Supp. 3d 20, 36 (D.D.C.

2020) ("Article 10(a)'s service-by-mail provision does not apply to service on a State, through its Central Authority; it applies only to instances where a plaintiff serves a third-party directly, cutting out the Central Authority."), *with Micula v. Gov't of Romania*, No. 17-cv-2332, 2018 WL 10196624, at *1–*3 (D.D.C. May 22, 2018) (holding that service was proper under Article 10(a) regardless of whether documents had been sent to Romania's Central Authority).

Lastly, Spain argues that the Foresight petition should be dismissed for "failure to prosecute service" because Foresight did not request a summons or attempt to serve it until six years after the petition was filed. *See* Mot. to Dismiss at 38. The D.C. Circuit has explained that dismissal "for failure to prosecute due to a delay in service is appropriate only when there is no reasonable probability that service can be obtained or there is a lengthy period of inactivity." *Barot*, 785 F.3d at 29 (quoting *Angellino*, 688 F.3d at 775). As explained above, service has already been properly effectuated. And as this court is well aware, there has been no "lengthy period of inactivity" in this case. *Id.*; *see* Opp'n at 30. Although the court expresses concern that Foresight has not demonstrated any good cause for failing to request a summons for six years, it also finds that Spain has not suffered any prejudice from the delay. Accordingly, the court exercises its discretion and permits the suit to proceed. *See Barot*, 785 F.3d at 29 ("[D]istrict courts have broad discretion to dismiss a complaint for failure to effect service." (quoting *Novak v. World Bank*, 703 F.2d 1305, 1310 (D.C. Cir. 1983)).

## IV. CONCLUSION

For the foregoing reasons, the court will DENY Spain's Motion to Dismiss. ECF No. 145. A separate Order accompanies this Memorandum Opinion.

Date: September 28, 2026

Tanya S. Chutkan
TANYA S. CHUTKAN
United States District Judge